IN THE
UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

CHARLES E. FORRESTER, JR.,
    Plaintiff,

v.                                    Civil Action No. 05-1847 (HHK)

BUREAU OF PRISONS,
    Defendants.

PLAINTIFF'S NOTIFICATION TO THE DEFENDANTS
IN CONJUNCTION WITH THE DEFENDANTS'
PROPOSED BRIEFING SCHEDULE

    Comes now the Plaintiff, moving pro se, and hereby respectfully submits his notification to the defendants in response to the Defendants' January 13, 2006 proposed briefing schedule ordered by the district court. In support of this notification to the Defendants, Plaintiff asserts that he is not wholly satisfied with the information released to him by the Federal Bureau of Prisons, for the reasons stated below:

    1. On January 17, 2006, Plaintiff received the Defendants' proposed briefing schedule, which erroneously depicts that Plaintiff

- 1 -

Exhibit A

attached the Privacy Act, 5 U.S.C. § 552a to his initial Freedom of Information Act complaint. See id. Plaintiff initiated his complaint pursuant to Title 5 U.S.C. § 552, **only**. Thus, the Defendants are encouraged to correct any errors in their records that are contrary to the latter.

2. On January 17, 2006, plaintiff received a packet from the Federal Bureau of Prisons ("FBOP") FOIA/Privacy Act Office, which contained a portion of the information that the Plaintiff requested in his August 1, 2005 F.O.I.A. request. See Exhibit One.

3. Plaintiff is satisfied with the fifteen (15) pages of Extra Good Time documents, and the single-page document (the BP-331(58)) that was enclosed in the packet. Therefore, paragraphs 3(b) and 3(c) of Plaintiff's complaint should be deemed moot.

4. Within the attached January 12, 2006, cover letter from the FBOP, it is stated that they have released fifty-eight (58) pages of the **contract** and its amendments. The letter also states that, "[t]he remaining forty-five (45) pages of the **contract and amendments** are being withheld in their entirety...". See Exhibit One, paragraphs 1 and 2.

5. Plaintiff asserts that the FBOP has **withheld** the **entire original contract**, number J1PCc-005, that was executed on February

22, 2000, by Wayne H. Calabrese, President, and on March 7, 2000, by Scott P. Stermer, contracting officer. The original contract should contain the following information:

- A. Solicitation/Contract Form
- B. Supplies or Services and Prices/Cost
- C. Description/Statement of Works
- D. Packaging and Marking
- E. Inspection and Acceptance
- F. Deliveries or Performance
- G. Contract Administration Data
- H. Special Contract Requirements
- I. Contract Clauses, etc.

In conjunction with the foregoing, there must be some reasonably segregable non-exempt information that should be released to the Plaintiff. See Exhibit Two, paragraph 2. Therefore, Plaintiff's request for a copy of the contract, Number J1PCc-005, has not been satisfied. Thus, paragraph 3(a) of Plaintiff's complaint is not moot. See Exhibit Three.

6. Plaintiff asserts that the FBOP has released fifty-eight (58) pages of amendments to the contract.[1] Therefore, Plaintiff

---

[1] Within the fifty-eight pages are amendments nine (9) through thirty-eight (38). Included in the fifty-eight pages are fifteen (15) duplicate pages, which are being returned to the Defendants. Thus, Plaintiff will retain the remaining forty-three (43) amendment pages. See the attachments.

has no interest in any additional amendments to the <u>original contract</u>.

7.  The FBOP has extended their bureau-specific appellate rights to the Plaintiff with respect to their response to Plaintiff's F.O.I.A. request. <u>See</u> Exhibit One, page <u>2</u>. Because Plaintiff has a pending F.O.I.A. complaint regarding the information outlined in paragraph <u>5</u>, <u>supra</u>, an appeal will not be submitted to the Attorney General. <u>See</u> 28 C.F.R. § 16.9(a)(3) ("[a]n appeal ordinarily will not be acted on if the request becomes a matter of FOIA litigation"). <u>See</u> <u>also</u>, Plaintiff's F.O.I.A. complaint, page <u>4</u>, paragraph numbered <u>6</u>.

8.  To reiterate, the BOP has withheld the entire contract from Plaintiff, notwithstanding their letter stating that "fifty-eight (58) pages of the <u>contract</u>...can be released in their entirety". Thus, Plaintiff's request for the contract has not been sufficiently satisfied to moot this litigation.

<div style="text-align:right">
Respectfully submitted,

/s/ _____
Charles E. Forrester, Jr.
Pro Se
Fed. Reg. No. 09565-007
P.O. Box 630
Winton, North Carolina 27986-0630
</div>

## CERTIFICATE OF SERVICE

This is to certify that I have this __19__ day of January 2006, sereved a copy of the foregoing upon the below-listed party by placing the same in the Rivers Correctional Institution prison mail box, addressed as follows:

>Benton G. Peterson
>Assistant United States Attorney
>555 4th Street, N.W. - Civil Division
>Washington DC  20530

_____
Charles E. Forrester, Jr.
Pro se

Sworn to before me this

__19th__ day of January 2006

_____
Notary Public

Embossed Hereon is My
Hertford County, North Carolina Notary Public Seal
My Commission Expires July 12, 2010
PAMALA DAVIS

- 5 -

Washington, DC 20534

January 12, 2006

Charles Forrester  
Reg. No. 09565-007  
Rivers Correctional Institution  
P.O. Box 630  
Winton, NC 27986

For Further Inquiry Contact:  
Federal Bureau of Prisons  
320 First Street. N.W.  
Room 841 HOLC Building  
Washington, D.C. 20534  
Attn: FOIA/Privacy Act Office

RE:   Request No. 05-08231

Dear Mr. Forrester:

    This is in response to your August 1, 2005, Freedom of Information Act request wherein you sought a copy of contract number J1PCc-005 and any subsequent amendments, documents concerning good-conduct time recommendations, and a Authorization To Receive Package or Property form.

    In response to your request, a copy of contract J1PCc-005 and all subsequent amendments consisting of one hundred three (103) pages; fifteen (15) pages of good-conduct time documents; and a one (1) page form were sent to this office for a release determination. After a careful review, we have determined that fifty-eight (58) pages of the contract and amendments, all 15 pages of the good-conduct time recommendations and the 1 page package authorization form can be released in their entirety. These seventy-four (74) pages are enclosed.

    The remaining forty-five (45) pages of the contract and amendments are being withheld in their entirety as they contain information that is related solely to the internal practices, the release of which could risks circumvent of laws or agency regulations, commercial or financial information obtained from a person and privileged or confidential, the release of which could cause competitive harm to the submitter, and information that is part of the deliberative process and contains frank and open communication concerning the policies and procedures, the release of which would tend to inhibit these discussions. The statutory basis for these withholdings are 5 U.S.C. 552(b)(2), (b)(4) and (b)(5).

Exhibit ONE

We trust this information is of assistance to you. However, pursuant to 28 C.F.R. § 16.9, if you are dissatisfied with this response, you may appeal to the Attorney General by filing a written appeal within sixty (60) days of the date of this letter. The appeal should be addressed to the Office of Information and Privacy, U.S. Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530. Both the envelope and appeal letter should be marked "Freedom of Information Act Appeal."

Sincerely,

Wanda M. Hunt
Chief, FOIA/PA Section

Enclosures

Federal Bureau of Prisons

Washington, DC 20534

October 24, 2005

The Honorable Eleanor Holmes Norton
Member, U.S. House of Representatives
529 14th Street, NW, Suite 900
Washington, DC 20045-1928

Attention: ███████

RE: ███████

Dear Congresswoman Norton:

We are in receipt of your correspondence to the Federal Bureau of Prisons (BOP) regarding the above referenced inmate. The inmate is confined at the Rivers Correctional Institution (RCI), a contractor-owned and operated facility located in Winton, North Carolina.

The BOP has a contract with The GEO Group, Inc. (GEO), formerly Wackenhut Corrections Corporation, for the management and operation of this low security institution housing male inmates. GEO is responsible for providing all services in accordance with the contract, which requires compliance with American Correctional Association and Joint Commission on Accreditation of Healthcare Organization standards, in addition to applicable federal, state and local laws. The BOP conducts contract compliance audits using staff who are on-site, in addition to a monitoring team stationed in our Central Office.

We believe RCI is in the best position to provide you information regarding your request. In order to be responsive, I have forwarded your correspondence to the RCI warden at the following address, who will respond to your inquiry.

    George Snyder, Warden
    PO Box 840
    Winton, North Carolina 27986
    (252) 358-5200

I trust this information has been of assistance.

Sincerely,

John M. Vanyur
Assistant Director

Exhibit TWO

## LAW LIBRARY

# What's cooking with Booker?

BY CHUCK ARMSBURY, RAZOR WIRE SENIOR EDITOR

Ohio law school Professor Douglas A. Berman advocates publicly for reforming US drug war laws and enforcement practices. His website provides a rich resource for updates and comment on Blakely, Booker and various drug war and other criminal law decisions.

To help foster new thinking about arguments for downward sentencing departures, Berman wrote in mid-November 2005 that the US House of Representatives found time to pass a resolution expressing disagreement with a recent Ninth Circuit Court decision about parental rights. Catching Berman's eye in the House resolution was the bold statement that "the rights of parents ought to be strengthened whenever possible as they are the cornerstone of American society."

Berman then asks, "Given the overwhelming approval of this resolution by the House of Representatives, should federal district courts apply their new Booker discretion to give greater weight to defendants' claims for a departure or variance on the basis of parenting responsibilities? The Eighth Circuit in Tolbert rejected a parental responsibilities claim. In that case, the defendant stressed that he was raising three children, that he stayed at home with his children, and that one child has asthma, another has a blood disease requiring yearly hospitalization and making him sick when exposed to the cold."

> SHOULD FEDERAL DISTRICT COURTS APPLY THEIR NEW BOOKER DISCRETION TO GIVE GREATER WEIGHT TO DEFENDANTS' CLAIMS FOR A DEPARTURE OR VARIANCE ON THE BASIS OF PARENTING RESPONSIBILITIES?

Undoubtedly, November Coalition families will understand and support the House declaration that the rights of parents ought to be strengthened whenever possible. "At the very least," wrote Berman, "the resolution suggests that most members of the House should be pleased to hear about departures or variances that district judges grant because of parental concerns."

Berman has a strong "feeling that congressional action in response to Booker is all but inevitable." He [illegible] there's a beltway buzz that only the House and the Senate may jump into Booker action come the one-year anniversary of the Booker decision." Humorously, Berman imagines "a giant cake being rolled onto the House floor on January 12 out of which will jump AG Alberto Gonzales holding the Booker fix minimum guidelines bill that the Justice Department wants enacted."

Anticipating the looming Booker fix debate, Professor Berman is starting a series of online posts under the title "Dead Booker walking?" "The goal of this series is to explore, one by one, the arguments which might be made in support of new sentencing legislation in response to Booker," Berman wrote on November 20th.

It seems the main elements and concerns of the "Booker fix" were expressed last summer in a speech by US Attorney General Alberto Gonzales who presented these chief arguments and reasons for a "Booker fix":

1. Concerns about "increasing disparity in sentences"

2. Concerns about "a drift toward lesser sentences"

3. Concerns about "key witnesses being increasingly less inclined to cooperate with prosecutors"

4. Concerns about defendants "receiving sentences dramatically lower than the guidelines range without any explanation, or on the basis of factors that could not be considered under the guidelines"

5. The need to "secure a system of tougher, fairer, and greater justice for all" *(Source: Berman Internet post, November 20, 2005)*

Berman recommends a published resource that examines the October 2004 Supreme Court from a criminal defense perspective. Available at Berman's website, it's entitled *"Reviewing The Supreme Court 2004-05 Term From A Defense Perspective"*. Following is the insightful introduction to the document's review of the SCOTUS term just completed:

"This Term has had an unusual array of cases that will affect the practice of federal criminal defense. In going through the opinions to look for hidden gems, three major themes emerge. First, the protection of core constitutional rights has solidified in a surprising number of cases. Second, the Doctrine of Constitutional Avoidance continues to provide a key analytical framework for federal litigation.

Lastly, the Court's devotion of so much time to the rules of statutory construction emphasizes the need for federal defense attorneys to incorporate them into our litigation vocabulary. The overall message is to hit constitutional issues hard, but layer them with statutory arguments that avoid the necessity of resolving the constitutional questions."

Professor Berman praises the diligence with which the "US Sentencing Commission's Booker webpage continues to update post-Booker sentencing data. USSC's latest update by close-of-business on November 1, 2005 includes the cumulative total, now covering almost 46,500 cases."

While complimenting the USSC's cataloguing work, Berman argues that "the Commission needs ASAP to start adding more flesh to the bare data bones of its periodic reports."

Berman argues that "cumulative and even circuit-by-circuit within-guideline data provide only a superficial view of post-Booker realities. District-by-district data and data on the extent of, and justifications for, departures and variances are essential for a true understanding of federal sentencing after Booker.

November Coalition members understand that informal, hidden procedures define US criminal law injustice. The grand question begging thought is whether the USSC will ever be empowered and capable of evaluating law enforcement practices when such behaviors are justified as necessary to be hidden from public monitoring and review.

(Source: Professor Berman's extensive online criminal defense information: www.sentencing.typepad.com/sentencing_law_and_policy/)

# Jail builder faces open records suit

A South Florida company hired to build a prison in Graceville and recently scolded for overbilling the state now faces allegations that it violated the Sunshine Law by withholding public records.

The Geo Group Inc. — a sprawling corporation that claims 28 percent of America's private prison market — was accused December 2, 2005 of ignoring a request for scores of documents related to its contracts with three Florida facilities, including audit records, lawsuit payments and court injunctions.

The company now has until later this month to respond to a public records lawsuit filed by *Prison Legal News* (PLN), a non-profit watchdog organization that publishes a monthly newsletter on prison issues and prisoners' rights.

According to the suit, *PLN* claims it requested in April information related to lawsuits that resulted in settlements or verdicts against Geo Group, as well as contract audits, violations and court-ordered injunctions. The company responded, according to Editor Paul Wright, with a simple spreadsheet that provided a limited amount of information related to one category of the request.

Wright said he then submitted a second request in September and since has been stonewalled.

"I do a lot of public records stuff and try to be fairly conservative with the requests," Wright said in a telephone interview Monday. "I guess when Geo or Corrections Corporation of America or the Department of Corrections in Florida and Washington get a letter or a phone call from *PLN*, they know it's not going to be good news.

"So they're pretty hostile with us. They hem and haw. That's the way they operate."

Florida's Sunshine Law is among the nation's most broadly sketched open-government statutes, giving citizens considerable access to most meetings and documents generated by public officials.

Exceptions to public records are numerous, with legislators adding between 10 and 20 new exemptions each year. There are currently about 800 exemptions in the law; the most commonly cited are investigative materials, security measures and personal details such as Social Security numbers and medical information.

Private companies such as Geo Group and CCA essentially stand as public entities in their dealings with the state, and are often contractually required to meet Sunshine Law standards. A state mediator can settle disputes, and violations are subject to criminal penalties ranging from fines to a year in prison.

Wright said *PLN* requested the documents to better understand how Geo Group was spending taxpayer dollars in South Bay, Moore Haven and Deerfield Beach. The company holds contracts to run state facilities in those cities, but also manages prisons in 13 other states and three other countries.

According to a 2005 annual filing with the U.S. Securities and Exchange Commission, the company reported $614 million in revenues. Geo Group initially was founded in 1984 as a division of Wackenhut Corporations: that company went public in 1994, merged in March 2002 with a Danish

CONTINUED ON NEXT PAGE

Exhibit Three

# Investigation details Abuse, Endangerment of Prisoners after Hurricane Katrina

### By Michelle Chen, writing for NewStandard News

**N**ov 18 — From a cramped jail cell, to neck-deep waters, to a lockdown on a desolate highway, the prisoners were trapped every step of the way.

"They told us if we didn't shut up, we were going to stay there another day," one former inmate of the New Orleans prison recalled after guards forcibly moved her, two days after Hurricane Katrina drove a torrent of water into her cell.

Yesterday, legal advocates with the American Civil Liberties Union (ACLU) publicized a collection of more than 70 testimonials gathered from former inmates of Orleans Parish Prison who claim their captors trapped, abandoned and mistreated them after the disaster hit on Aug. 29. The reports counter earlier claims by the police department the facility was evacuated quickly and safely.

The published statements of the female and male detainees, all anonymous to protect the identities of the witnesses, relate a sense of utter helplessness as inmates skirted death in Katrina's wake, languishing for days with little food or water. The stories detail the terror of being locked in their cells as floodwaters rose and physical assaults by prison staff as they were herded onto the overpass of Interstate 10, where they waited to be picked up and shipped to other facilities.

One inmate said the "floodwater got up to six feet, up to my neck, and I'm six-one. I really thought I was going to die." He recalled that some inmates flocked to the jail windows calling for help. According to the testimony, though guards initially ignored the pleas, he was eventually moved onto the I-10. Throughout the evacuation process, he said, guards subjected him to brutal treatment as he was surrounded by floodwaters rife with waste and corpses. The inmate reported witnessing more abuse by prison guards after being transferred to facilities in other parishes.

Another witness stated that after "the deputies left us for dead," some inmates attempted escape and were shot at. Others recounted that while waiting on the overpass to be taken to safety, guards deprived them of food and water and brutalized them indiscriminately.

According to the testimonies, guards used attack dogs, electroshock weapons and pepper spray to subdue prisoners; inmates were sprayed when they tried to stretch their legs or asked for food, or sometimes for no apparent reason. One former detainee recalled that his keepers denied him his blood-pressure medication and threatened to shoot him if he asked for it again.

In one of the prison buildings, female prisoners were crowded on the second floor to escape the floodwaters that had overtaken the first floor. "People crammed like sardines – it was horrible," stated one inmate, who had been housed for a few weeks at the facility while awaiting trial. Some female inmates reported being forced to drink water from a garbage can as filth and feces piled up around them.

> IN ONE OF THE PRISON BUILDINGS, FEMALE PRISONERS WERE CROWDED ON THE SECOND FLOOR TO ESCAPE THE KATRINA FLOODWATERS THAT HAD OVERTAKEN THE FIRST FLOOR. "PEOPLE CRAMMED LIKE SARDINES — IT WAS HORRIBLE," STATED ONE INMATE WHO HAD BEEN HOUSED FOR A FEW WEEKS AT THE FACILITY WHILE AWAITING TRIAL. SOME FEMALE INMATES REPORTED BEING FORCED TO DRINK WATER FROM A GARBAGE CAN AS FILTH AND FECES PILED UP AROUND THEM.

In response to charges that authorities mistreated prisoners after the hurricane, Orleans Parish Sheriff Marlin Gusman told CNN in an interview in October, "I make no apologies. It was tough. But we did it safely." Denying claims that some prisoners were trapped for days, he stated, "We evacuated everyone out of this jail before the city was evacuated. That's a fact."

This is not the first time prisoners' rights issues have surfaced in investigations of failures in the governmental response to Katrina.

In September, the international advocacy organization Human Rights Watch urged the Justice Department to conduct an investigation of the treatment of inmates during the catastrophe. The group alleged that Gusman had not initiated an evacuation of the prison until midnight on Monday, August 29, while other parishes had begun their evacuations on Saturday or Sunday. By that date, according to Human Rights Watch's investigation, prison staff had completely abandoned one building on the compound, Templeman III, with more than 600 prisoners still inside.

The evacuation of the prisoners was not complete until Fri., Sept. 2, the group reported, and over three weeks after the storm, more than 500 inmates remained unaccounted for.

The ACLU is currently litigating a federal class-action lawsuit on behalf of an estimated 6,500 New Orleans prisoners who were left behind in the hurricane, claiming that the lack of an adequate evacuation plan violated prisoners' civil rights.

As of early November, Orleans Parish Prison officials had not responded to the organization's requests for information regarding the evacuation plans and any deaths that occurred at the facility after the hurricane. In a statement criticizing the non-response, Joe Cook, executive director of the ACLU of Louisiana said, "We need to know why Orleans Parish Prison fell into complete chaos while surrounding parishes managed to evacuate guards and prisoners to safety. Only then can we prevent this from happening again."

Source: The NewStandard News (www.newstandardnews.net)

LAWSUIT ... CONTINUED FROM PAGE 12

company and in 2003 became the majority shareholder. The group changed its name to Geo Group in November 2003.

Earlier this year, the state awarded the company with a contract to design, construct and operate a 1,500-bed prison in the Graceville Industrial Park. The $68 million facility will house medium-security and close-custody inmates, and is scheduled to open in 2007.

The contract was awarded by the same state agency that publicly rebuked the Geo Group earlier this year, concluding in an audit that Geo and CCA received "questionable contract concessions" and overbilled taxpayers by $12.7 million.

According to an audit by the Department of Management Services, the now-defunct Correctional Privatization Commission — which was to oversee private prison contracts in Florida — allowed the companies to bill for vacant positions and avoid minimal requirements for nurses, vocational trainers and teachers.

The commission also allowed inmate welfare funds to be used to cover chaplain and library services that the companies were required to provide. Both the commission and the two companies should share the blame, according to a state spokesman.

"There's responsibility on both sides," spokesman John Kuczwanksi told The News Herald earlier this year.

Said Wright: "I really hate to say this, but there is no 'best' private corrections company. None of them really stands head-and-shoulders above the rest. They all kind of do the same thing: understaff their facilities so they can make a financial profit."

Source: Miami News Herald

(Editor: Paul Wright receives mail at 972 Putney Road, # 251, Brattleboro, VT 05301. Telephone: 802-257-1342, email Paul - pwright@prisonlegalnews.org

Prison Legal News Website - www.prisonlegalnews.org)